UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

CYPRESS DRILLING, INC.                   CIV. ACTION NO. 06-0556

VERSUS                                             JUDGE ROBERT G. JAMES

WILLIAM K. GRIFFIN, III, ET AL.          MAG.  JUDGE KAREN L. HAYES


OPINION

This is a civil action arising from a drilling contract between Plaintiff Cypress Drilling, Inc. ("Cypress") and Defendant Griffin & Griffin Exploration, L.L.C. ("Griffin").  Cypress brought suit against Griffin and its insurer, Interstate Fire and Casualty Company ("Interstate")[1], alleging that Cypress suffered damage to its drilling rig and component parts as a result of Griffin's breach of contractual duty to provide a sound drilling location and that Griffin has failed to pay for the damages.  Additionally, Cypress alleges that Griffin breached their contract by failing to pay amounts due for two wells Cypress drilled and by contracting with another company to drill wells covered by the contract between Cypress and Griffin.  Griffin denies liability for damage to Cypress's rig and for unilateral termination of their contract.  Griffin does not deny Cypress properly billed it for amounts due and owing related to the drilling of two wells, but contends that it is entitled to a setoff for amounts it paid to the drilling contractor which replaced Cypress.

Griffin brought a third party complaint against R.W. Delaney Construction Company ("Delaney"), which furnished the labor, equipment, material, and direction to prepare the drilling location at issue.  Griffin contends that Delaney was responsible if the drilling location was not

_____

[1]For ease of reference, the Court will refer to Griffin and Interstate collectively as "Griffin."

sound.  Delaney denies liability.

Prior to trial, Griffin and Delaney filed Motions in Limine [Doc. Nos. 89, 90, & 91] moving the Court to exclude or limit the testimony of Cypress's experts, Charles Furlow and Paul Oldershaw.  Cypress opposed the motions.  The Court took these motions under advisement.

This matter came for trial before the Court on August 19-26, 2009.  At the conclusion of Cypress's case, Griffin and Delaney orally moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).  [Doc. No. 141].  The Court also took these motions under advisement.

At the conclusion of trial, the Court ordered the parties to file post-trial briefs within thirty days of their receipt of the official transcript.  Responses to the post-trial briefs were due fifteen days from the date the post-trial briefs were filed.

On October 26, 2009, the court reporter filed the transcript of the trial.  However, the parties requested and received an extension until December 18, 2009, to file post-trial briefs.  Responses were due on January 6, 2010.

The parties have submitted timely post-trial briefs.  *See* [Doc. Nos. 156, 159 & 164]. They have also submitted timely responses.  *See* [Doc. Nos. 165, 171 & 173].

On January 20, 2010, the Court granted Griffin's motion to file objections to the post-trial briefs of Cypress and Delaney asserting that the parties had made arguments and/or referred to evidence outside the presentation at trial.  [Doc. No. 176].  The Court ordered Cypress and Delaney to file any response by February 3, 2010.  Cypress and Delaney filed responses.  [Doc. Nos. 177 & 178].

The Court hereby enters the following findings of fact and conclusions of law.  To the extent

that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Findings of Fact

Griffin held leasehold interests in the oil, gas, and minerals in a number of tracts of land in Wilkinson County, Mississippi.  In 2005, Griffin sought to drill ten natural gas wells on these tracts of land.

On March 7, 2005, Delaney submitted a bid by letter to build the location of the second well, B.R. F-46.  The bid was accepted by Griffin on or about that date and became the contract between the parties.  Under the contract, Delaney agreed to  "[f]urnish labor, equipment and material to clear road, clear location, level location, dig all necessary pits, move rig in, service rig, move rig out and trench and bury drilling fluids."  [Exhibit 100].  Griffin did not ask Delaney to have a soil compaction study performed, nor is it industry practice to have a soil compaction study or a standard proctor density test performed prior to preparing a location for drilling.  Griffin had worked with Delaney on drilling locations for approximately thirty years and had never had a problem with sites prepared by Delaney.

On or about March 10, 2005, Griffin, as operator, entered into a daywork drilling contract with Cypress, as drilling contractor, for the drilling of all ten natural gas wells in Wilkinson County. The first well was completed under this contract, but there were unanticipated delays.[2]  Because of the delays, Griffin did not want to pay for the drilling of the remaining wells using a day rate.  Griffin

---

[2]Cypress had to fix an engine that malfunctioned, and Griffin advanced $20,000.00 for the repair.  Cypress also had problems with vegetation clogging its mud pumps.

requested, and Cypress agreed, that the parties enter into a footage drilling contract.

On or about April 26, 2005, Cypress and Griffin entered into an International Association Drilling Contract ("IADC"), Drilling Bid Proposal, Drilling Contract-US ("IADC contract").[3]  Under this standard form contract, Cypress agreed to drill B.R. F-46, the well at issue in this case, and the other eight natural gas wells for Griffin on a footage basis.[4]

As operator, Griffin was contractually responsible for providing a sound location.  Section 15 of the contract details Griffin's duty and potential liability:

> **Operator should prepare a sound location, adequate in size and capable of properly supporting the drilling rig** and shall be responsible for a conductor pipe program, adequate to prevent soil and subsoil washout.  It is recognized that the Operator has superior knowledge of the location and access routes to the location, and must advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and telephone lines) which Contractor might encounter while en route to the location or during operations hereunder.  **In the event subsurface conditions cause a cratering or shifting of the location surface**, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, **Operator shall, without regard to other provisions of this Contract, reimburse Contractor to the extent not covered by Contractor's insurance, for all such loss or damage including payment of work stoppage rate during repair and/or demobilization if applicable**.

[Exhibit 127 (emphasis added)].

Delaney supervisor, Randy Paul Delaney, and operator, Willard Smith ("Smith"), described the area where B.R. F-46 was to be built as having a small hill with a lot of briars and small trees.

---

[3]The IADC contract is a standard form contract drafted by the industry group that represents drillers and contains boiler plate language and blank spaces to be filled out by the contracting parties to reflect their specific agreement.  The IADC form used by the parties was prepared by Mixon's wife, Vikki Mixon.

[4]Griffin agreed to pay Cypress $10.50 per linear foot.

There was no running stream[5] through the location, but there was a natural drainage ditch that was re-routed, so it would not drain into the mud pits used during drilling.  Neither Randy Paul Delaney nor Smith, both of whom have built hundreds of locations over the past thirty years, considered this a "bad" location.  They gauged the location as "three" on a scale of one to ten, with ten being the worst location.

After Delaney built the location for Griffin,[6] Cypress asked Delaney to change the angle of the rig from south to east, so there would be additional surface area available for Cypress to turn its trucks around.  Delaney notified John Andrew Griffin, Vice-President of Griffin, of this request, and he agreed to allow Delaney to modify the location as Cypress requested.  Delaney complied with all conditions of its contract with Griffin.

Once the location was prepared, Cypress began preparing to drill approximately 3,500 feet.  Cypress was using a Spencer-Harris portable rig fabricated and/or modified by Donnie Mixon ("Mixon").[7]  Mixon Bros. Drilling, Inc., a corporation in which Mixon and his wife and business parter, Vikki Mixon ("Mrs. Mixon"), are shareholders, purchased the drilling unit, two engines, the

---

[5]Mixon referred to this drainage ditch or watershed as a "creek," but the Court accepts the testimony of Randy Paul Delaney and Smith that it was not an actual creek or stream with running water, but a ditch that sometimes had water in it as a result of rain.

[6]Delaney is not a party to the contract between Cypress and Griffin.  In ruling on Delaney's Motion for Summary Judgment, the Court previously determined that Delaney complied with its duties under the contract between Delaney and Griffin.  Delaney remains in this litigation because the Court found a genuine issue of material fact for trial as to whether Delaney was negligent in its performance of those duties.

[7]The derrick was a Spencer-Harris 7000 model, but it was mounted on a Spencer-Harris 6000 triple axle trailer.

draw works, trailer, and the derrick.[8]  Mixon brought the equipment back to his yard where he did

some fabrication, using both factory parts, such as four screw jacks, and non-factory parts, such as

an H-beam.[9]  Additionally, Mixon used an aftermarket substructure with this rig.

The rig was attached to a semi-trailer and transported to the B.R. F-46 well site.  At the site,

the rig was set up.  Cypress employees began by laying matting boards on the prepared site.  Then

they backed the rig up onto the ramp and placed it on a leveling bar.  Two screw jacks were welded

under each side of the leveling bar.  The ramp was welded to the substructure, but the only

connection between the trailer base and the substructure was two drop pins used to secure the trailer

frame to each side of the leveling bar.  There were "u" flanges which could have been used to bolt

the rig to the substructure, but Cypress did not use bolts.  The Spencer-Harris manual Mixon had

available[10] instructs that stabilizer turnbuckles be installed to secure the trailer frame to either jack

bases or the substructure.  Cypress's backup ramp and trailer base had three eyelets, so turnbuckles

could have been used to connect the trailer to the ramp.  Turnbuckles were readily available at any

oilfield supply store, but Cypress chose not to use these either.

---

[8]Prior to trial, Griffin moved for summary judgment, contending that Cypress has no interest in this litigation because the drilling rig is not owned by Cypress, but by Mixon Bros. Drilling Company. Cypress, in which Mixon and Mrs. Mixon are also the sole shareholders,  contends that Mixon Bros. leased the rig to it.  The Court denied summary judgment, finding a genuine issue of material fact whether an existing lease from Mixon Bros. to Cypress had been modified to include the rig or whether there was an implied lease of this rig from Mixon Bros. to Cypress. Given the Court's conclusion, it need not reach this issue, but notes that it is likely that, at the least, there was an implied lease between Mixon Bros. and Cypress.

[9]Prior to the turn over, Mixon had used this same rig to drill three wells: one in Start, Louisiana; one in Jena, Louisiana; and one previous well in Mississippi for Griffin.

[10]Mixon's Spencer-Harris manual was old, but the equipment was also manufactured in approximately the 1960s.  Mixon did not attempt to obtain a newer version of the manual.

Instead, Mixon fabricated a belly jack to stabilize the trailer base.  The top portion of the belly jack consisted of two "u" shaped iron pieces that fit tightly on the trailer frame and were also held in place with pins through the trailer base.  Mixon had welded a cup onto each "u" shaped piece as a holder or receiver for the bottom portion of the belly jack.  The bottom portion of the belly jack consisted of two iron pieces as sides and an H-beam joining the pieces together.  The bottom portion was hinged to the backup ramp, but fit within the tandem of the trailer base, so that it could be folded over or laid down and moved easily.[11]

In rigging up, the Spencer-Harris manual instructs that two ½" guy wires (also known as wind wires) be attached to eyelets on each of the two outside corners of the monkey board[12] and then run to "'dead men' anchors or any suitable object to help stabilize the monkey board against pipe setback[13] and wind loads." [Exhibit 118-20].   The American Petroleum Institute ("API") also recommended the use of these guy wires.  Bob Boyette ("Boyette"), Griffin's drilling manager, who was on site at the drilling of both the first and second wells, requested that Cypress use the guy wires.  Cypress had guy wires and anchors available, but did not use them because it was not Mixon's practice over the years, nor that of companies he had worked for, to attach guy wires to the monkey board unless he was drilling a well in excess of 5,000 feet.[14]

---

[11]Mixon's fabrication did not extend the belly jack to the width or beyond the width of the tires on the trailer frame, but he believed his fabrication was just as stable because, in his opinion, the whole backup ramp became the base.  *See* Exhibit 89 [Picture #20 illustrating the typical technique].

[12]The monkey board is the platform where the derrickman stands while racking back the drill pipe.

[13]Pipe setback refers to movement of the pipe in the derrick.

[14]Cypress did use four guy wires to secure the rig, but those wires ran from the crown of the derrick to the "headache" rack, not from the monkey board to anchors in the ground.

Once Cypress employees rigged up, they began drilling.  On the fifth day, May 7, 2005, Cypress completed drilling, reaching a depth in excess of 3,800 feet.  Mixon was working at the site that day because one of his employees, a driller, had become ill.  Once depth was reached, Cypress employees removed the drilling pipe from the wellbore or "hole" and stood it in the derrick in two sections.  Employees then performed a "wiper trip," running the pipe back through the hole to clean it out.  After the wiper trip was completed, employees removed the drilling pipe from the hole and stacked it in the "fingers" of the rack.  The pipe, which weighs 14.4 pounds per foot, was distributed with 2/3 of the pipe stacked on the north side, and 1/3 of the pipe stacked on the south side.  The drilling collars, which weigh 1800 pounds each, had been stacked, so that there were six collars on the north side and two collars on the south side.

Once the pipe and drill collars were stacked, the derrickman tied the pipe off to prevent it from falling in towards the derrick.  The derrickman made two tieoffs.  He tied pipe on the north side together and then tied off that stack to the handrail.  He also tied the pipe on the south side together and then tied off that stack to the handrail.[15]  Once the pipe was stacked and tied off, the rig was at its greatest point of instability.

Between 6:30 and 7:00 P.M. Cypress employees completed their work and took a break while the logging company got ready to check the hole.[16]  Mixon left the site.

Around 10:30 P.M., the logging company had completed its work, so Cypress employees

_____

[15]Although the Cypress employee working as derrickman on the day of the accident was not called to testify, Cypress employee, Keith Bridges, provided undisputed testimony that he saw the derrickman tie off the pipe as described.

[16]The logging company, Admyr, was hired separately by Griffin to perform certain tests that are used to determine well production, i.e., to determine if the well is dry or will produce natural gas.

8

were about to return to the rig to "trip" back in the hole, place drilling fluid or mud in it, and then begin laying casing pipe.

Cypress driller/swapover hand, Keith Bridges, was the first to return to the rig.  As he was about to step up, he grabbed the handrail and felt it shaking or jerking, looked up and saw the rig turning over.  Another Cypress employee, Kendall Parker, was not looking at the rig, but heard pipe "tingling" in a way that it should not, and then turned around to see the rig had fallen over. [Transcript, p. 1048].  The turn over caused property damage to the rig and component parts, but, fortunately, no injuries.

After the rig turned over, Cypress employees notified Mixon, who was staying in a trailer about five or six miles away, and he came to the site.  John Andrew and William Griffin, the President of Griffin, were at the site, and, when he was notified, Boyette also came out to the site. Cypress employees had turned off the engines and taken steps to fill the hole with driller's mud to keep the pressure stabilized and prevent a blowout.  Mixon, the Griffins, and Boyette agreed that, since it was dark, they would look at the rig the following morning.

The next day, Mixon and Boyette returned to the site to assess the damage.  Boyette, who has many years of experience in the industry, noted that the rig was not connected to the substructure as it should have been.  At some point, either the night before or on this day, Boyette told Mixon that Griffin would not be able to continue with its contract.

Mixon walked around the site, took pictures, and tried to determine what happened.  He noticed that the ground was wet on the north side.  The sub-structure was still sitting on the matting board, and a level placed on the leveling board (or T-bar) indicated that it was slightly high to the north, the direction the rig fell.  A level placed on the rig floor showed that it was less than 1/4" off

9

level.  There was a crack along the edge of the matting board toward the north side, but there was no height variation from one side of the crack to the other.  The area where the crack appeared is on the wet end of the drilling rig where drilling fluid or mud accumulates.[17]

When the rig turned over, the belly jack broke off from the ramp, but stayed connected to the trailer base on one side of the top portion.  One of the pins on the leveling board was sheared off, but the other pin was in place, although it was unclear whether the board had not been pinned prior to the accident, someone had replaced the pin, or if only the top of the pin had been sheared off and the remaining part fell back in.  At least one of the drilling stand legs was bent.  The handrail on the derrick also appears to have been bent, although it is not clear whether it bent  from the weight of the pipe or upon impact.

Mixon and Mrs. Mixon decided to hire an expert to test the soil at the site.  Cypress retained Charles Furlow ("Furlow"), a professional engineer, who came to the site and performed a geotechnical investigation.[18]  Furlow is a recognized soil expert, but has no experience in the oil and gas industry.  On May 11, 2005, Furlow came to the site and brought equipment that he used to take two soil samples, both approximately four feet from the wellhead.  Cypress then took steps to remove its rig and equipment from the site and have it repaired at a yard.

On May 15, 2005, Cypress sent Invoice No. 50 to Griffin for the drilling of B.R. F-46 well, in the sum of $39,900.00, with credit against that sum for an advance in the amount of $20,000.00, leaving a balance of $19,900.00.  On May 16, 2005, Cypress sent Invoice No. 51 to Griffin for fuel

---

[17]Instead of using pipe to move the drilling fluid to the mud pit, Cypress used an alternative method of digging a trench within one foot of the matting board, so that the fluid would flow to the mud pit.

[18]Mrs. Mixon, who is a geologist, knew a geologist who worked with Furlow at the time.

surcharges payable to Cypress under the contract for the drilling of the first well in the sum of $2,455.53.  Griffin did not object to the invoices within fifteen days as provided under the IADC contract, but never paid Cypress for these invoices.

Griffin secured another contractor, Tri-State Drilling ("Tri-State"), to complete the casing of B.R. F-46 and drill the remaining wells provided for in the IADC contract between Cypress and Griffin.  John Andrew Griffin had met with Tri-State on the Friday before the rig turned over because of concerns about Cypress's performance.  However, he did not contract with Tri-State until after the rig fell.

On May 28, 2005, the Cypress rig and equipment were transported to Sharpco, a repair yard in Monroe, Louisiana.

On July 13, 2005, Griffin's attorney formalized Boyette's termination of the contract between Griffin and Cypress by sending a letter to Cypress's attorney, James Mixon.

Repairs of Cypress's rig and equipment were not completed until more than two months later, September 26, 2005.

### B.    Conclusions of Law

In order to prevail on a breach-of-contract claim, the plaintiff must prove by a preponderance of the evidence that a valid contract exists, the defendant breached the contract, and damages resulted from the breach.  *Warwick v. Matheney*, 603 So.2d 330, 336 (Miss. 1992).  In this case, it is undisputed that there was a valid contract between Cypress and Griffin.  However, the parties dispute whether the contract was breached and whether damages resulted from the alleged breach.

In this case, Cypress has three breach of contract claims: (1) Griffin breached the contract by failing to provide a sound location, resulting in the rig turn over; (2) Griffin breached the contract by

11

failing to pay Invoice Nos. 1050 and 1051 for amounts due to Cypress for completed drilling operations and fuel surcharges; and (3) Griffin breached the contract by unilaterally terminating it and hiring another contractor to complete the casing of BR F-46 and the drilling of the remaining wells under the IADC contract.

### 1.      Rig Turn Over

To recover from Griffin for the rig turn over, Cypress had to prove by a preponderance of the evidence that Griffin failed to provide "a sound location, adequate in size and capable of properly supporting the drilling rig" and that "subsurface conditions cause[d] a cratering or shifting of the location surface," resulting in damages to the rig.  [Exhibit 127].  Cypress failed to meet this burden.

"Under Mississippi law [19], where the contract is not ambiguous, the intention of the contracting parties should be gleaned solely from the wording of the contract." *Turner v. Terry*, 799 So. 2d 25, 32 (Miss. 2001).  If the contract is clear and unambiguous, the Court does not "go outside the 'four corners' of the contract to determine the parties' intent" and it "must accept the plain meaning of a contract as the intent of the parties." *Breland v. Amanatidis*, 996 So. 2d 176, 179-80 (Miss. Ct. App. 2008).  Extrinsic evidence and interpretive theories may only be used to determine intent when the writing itself is ambiguous or otherwise unclear.  *See Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 428 (5th Cir. 1996).  "One of the accepted rules of interpretation is that 'technical terms and words of art are given their technical meaning when used in a transaction within their technical field.'" *Infinity Ins. Co. v. Patel,* 737 So.2d 366, 369 (Miss. Ct. App. 1998) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(B) (1981)). The Court finds that the words of the IADC contract are plain and their meaning clear.

---

[19]The choice of law provision in the IADC contract between Griffin and Cypress requires Mississippi law to be applied to any interpretation of that contract.

Cypress could recover damages from Griffin only if Griffin failed in its duty to "prepare a sound location" and "subsurface conditions cause[d] a cratering or shifting of the location surface," resulting in "loss or damage to the rig or its associated equipment."  *See Miller Exploration Co. v. Energy Drilling Co.*, 130 F. Supp.2d 781, 786-87 (W.D. La. 2001) (interpreting the same provision in an IADC contract and concluding that the first portion of the paragraph "indicates that the operator is responsible for selecting an appropriate location for the rig and for warning the contractor of potential obstacles beneath the surface," but the "second portion of the paragraph makes the operator liable for damage caused by subsurface conditions.").  While both Griffin and Delaney moved to exclude the testimony of Cypress's two experts, Furlow and Paul Oldershaw ("Oldershaw"), even if the Court were to accept their testimony, only Furlow is the soil expert.  Furlow testified that the soil had the proper characteristics to bear the weight of the rig if properly compacted, but the soil had excessive vegetation, had voids, and a greater amount of fill (6 ½ feet) on the north side than on the south side (3 ½ feet).  Based on the analysis of the samples he took and the tests he performed, Furlow opined that Delaney failed to compact the soil adequately, resulting in differential soil settlement, but not cratering or shifting of the location surface.  [Trial Transcript, p. 1301, lines 3-5 (Question:  "Ok. So it's your testimony that there was settlement, not shifting or cratering?  Would you agree with that?"  Answer:  "Yes.")].  Thus, under the plain language of the contract, Cypress is not entitled to recover for damages caused by the rig turn over.

Alternatively, if the contract were read to mean that Cypress could recover if it showed that Griffin failed to "prepare a sound location" because there was differential soil settlement,[20] Cypress

---

[20]The Court does not believe that this is the appropriate interpretation of the contract, but offers this analysis if its interpretation is incorrect.  The Court notes that, under either interpretation, Cypress has offered no evidence of any other alleged breach of Griffin's duty to provide a sound location.  The testimony was undisputed that the location appeared on the surface to be sound; thus,

cannot meet its burden on causation.

This was a difficult case.  Griffin hired Delaney, just as it had done on jobs for more than thirty years, to prepare the location.  Delaney prepared the location in the same manner it had for more than thirty years.  Cypress rigged up in the same manner it had many times before in Mixon's thirty years of drilling, and Mixon used the same rig, rigged up in the same way, as he had for one prior job for Griffin and two other jobs, all without incident.  Neither Griffin nor Delaney had ever had a foundation fail.  Neither Cypress nor its principle, Mixon, had ever had a rig turn over.  Despite the experience of all involved, this time something went wrong.

However, Cypress, as Plaintiff, bears the burden of proving its theory by a preponderance of the evidence.  Under that standard, the Court cannot find that Cypress has proven failure of the foundation was the cause of the rig turn over.  Certainly, Cypress has offered some evidence to support its theory: the crack along the matting board; the expert testimony of Furlow and Paul Oldershaw[21] that there was uneven or differential soil settlement and guy wires might have delayed, but would not have prevented, the turn over; and the eyewitness testimony of former Cypress employees, Keith Bridges and Kendall Parker, that the rig seemed to tip over quickly.  Cypress's theory that the rig turned over as a

--------

the argument has been limited to the subsurface conditions of the soil.

[21]Griffin and Delaney have moved to exclude the testimony of both experts.  Given the Court's conclusions, those motions are MOOT.  For the record, the Court notes that Oldershaw's calculations presented to counsel prior to trial were incorrect, but Oldershaw was allowed to testify, so that the Court would have complete information prior to rendering a decision in this case.  The Court is aware that it placed the parties in a difficult position by requiring their experts to prepare and respond to final calculations, but the Court found those calculations necessary to its understanding of the case. While Oldershaw did not have the same educational background of Cypress's expert, Ralph Busse, Oldershaw does have a degree in engineering and significant experience in the industry, including in the design of masts.  *See* Fed. R. Evid. 702.  The Court found Oldershaw's testimony helpful to it as trier of fact to understand the key issues in this trial.

result of dynamic movement caused by soil settlement has some appeal.  To a lay person, including the Court, the idea that the maximum load had been on the ground for 4 ½ hours prior to the fall, the soil settled, and the rig suddenly fell, makes some sense.

Yet, Griffin and Delaney presented evidence adverse to Cypress's theory and consistent with their theory that the rig turn over was the result of Cypress's failures.  Specifically, Griffin and Delaney identified the following problems with Cypress's rigging up and drilling procedures:

- Cypress did not comply with manufacturer recommendations to use turnbuckles to stabilize the rig;

- Cypress did not comply with manufacturer and API guidelines to use guy wires from the monkey board to deadmen anchors in the ground;[22]

- Cypress did not use additional bolts or pins to stabilize the rig, even though there were eyelets and "u" flanges available for this purpose;

- Cypress did not brace the drilling stand legs or place them in holders as demonstrated in the Spencer-Harris diagrams;

- Cypress did not stack the pipe and drill collars with the weight evenly distributed; and

- Cypress did not tie the pipe off to a secure point, such as on the derrick, but to the less secure handrail.

Griffin and Delaney supported their theory with the testimony of their expert, Ralph Busse ("Busse"), a civil  engineer, who has extensive relevant work experience, has authored API guidelines, designed portable rigs, developed a patented freestanding mast, and conducted over 250 accident reconstructions. Busse testified that a portable rig cannot be built perfectly level and that some degree of soil settlement is expected, which is why leveling jacks are used.  He asserted that the rig turned over, not because of

---

[22]Cypress pointed out that the IADC contract required the operator, Griffin, to provide these anchors.  However, the Court cannot credit this argument when Cypress had the anchors available to use.

soil settlement, but because of the lack of stability of the rig.  It is undisputed that the pipe and drill collars were unevenly distributed when they were stacked.  Busse opined that this unbalanced load would have been "resisted" by guy wires run from the monkeyboard to deadmen anchors, but Cypress failed to use the guy wires.  Busse believes that the lean of pipe stacked in the rack either slipped out of the rope or, because of the way the pipe was tied, the handrail bent, and the pipe then rolled outside its stacking fingers, i.e., "swarmed," causing the rig to turn over.  At the point the lean of pipe moved and the rig passed the point of rotation, the rig turned over.[23]  The lack of stability because of Cypress's failure to use guy wires was compounded by Cypress's failure to use turnbuckles.  Busse did not believe that Mixon's belly jack design improved the overturn stability in any degree,[24] and he further opined that the pipe should have been tied off to the sturdier frame of the derrick, not the handrail.  Finally, using engineering calculations, he rejected Cypress's theory because he calculated (including the weight of the drill pipe) that the soil would have had to settle 43" for the rig to overturn, and the evidence did not support such significant settlement when Mixon indicated that the rig was level when the pipe was removed from the bore hole prior to the fall.[25]

_____

[23]The parties were in agreement that there was not significant wind the night of the accident, but a breeze.  Bridges, who was physically present at the time of the fall, described it as "enough to keep the mosquitoes off of you," but not enough to blow "a cap off your head." [Transcript, p. 530]. However, Busse explained that even a small amount of wind, vibrations, or other factors could assist in tipping the rig over once it began to approach the point of rotation.

[24]Cypress argues that Busse's opinion misconstrues the purpose of the belly jack.  Cypress contends that the belly jack would not improve stability at the point the pipe was stacked because the weight of the pipe was on the rig floor and over the substructure.  However, this argument only serves to enforce Busse's concerns about Cypress's failure to use guy wires and, to a lesser degree, turnbuckles.

[25]Oldershaw admitted on cross-examination that his calculations could have been performed in another way that would have resulted in a greater number of inches of settlement to tip over, although he still disputed that 43" was required.

16

Cypress disputes that the rig was less stable because of the methods it employed.  Cypress contends that the rig was stable because Mixon used alternative stabilization methods by fabricating a belly jack to support the rig and using vertical pins to connect the trailer to the leveling bar.  Cypress denies, through lay person testimony, that guy wires were necessary when drilling less than 5,000 feet or that braces were necessary for the drilling stand legs. Cypress points to Mixon's many years of experience and his testimony that, during the drilling of the prior well for Griffin, Cypress stacked all pipes on one side and tied them off as they did in this case without incident.

Mixon's methods, while based on his years of experience, were not recommended or approved by an engineer or other appropriate professional prior to their implementation; are not consistent with any manufacturer or industry guidelines; and  after the rig was repaired, the belly jack was no longer used in the way Mixon used it.[26]   In truth, Cypress had used this rig with this particular rigging up method to drill only one well that exceeded 2,000 feet.

The Court is aware of Cypress's successful drilling of the prior well using these same methods. The Court also recognizes the fact that even defense expert Busse acknowledges that we do not know and cannot know for certain what caused the rig to pass the point of rotation.[27]  Despite the appeal of Cypress's theory from a layperson's standpoint, the facts and testimony lead the Court to conclude that Griffin and Delaney's theory that Cypress's rigging up and drilling methods caused the rig turn over is just as probable as Cypress's theory that the foundation failed.  The Court need not find that Griffin

---

[26]With regard to the vertical pins, Cypress could have used methods, e.g., a carter key, to prevent the pins from coming out, but did not do so.

[27]The Court recognizes that Busse originally believed that the pipe swarmed because it was not tied off, but, after hearing testimony at trial that the pipe was tied off to the handrail, Busse changed his opinion that either the pipe slipped out of the tie-off in the racking board or the handrail bent, allowing movement of the pipe.  However, Busse was both candid and credible about his theories.

and Delaney proved their theory by a preponderance of the evidence.[28]  Rather, because the burden is on Cypress, it is enough for the Court to find that Cypress failed to establish by a preponderance of the evidence that Griffin breached its duty to prepare a sound location.

Judgment is rendered in favor of Griffin and against Cypress on this claim.  As this claim serves as the basis for Griffin's claim against Delaney, that claim is moot.

### 2.       Invoice Nos. 1050 and 1051

Cypress's second claim is that Griffin failed to pay Invoice Nos. 1050 and 1051.  Cypress has offered evidence that it completed the drilling operations for B.R. F-46, upon which Invoice No. 1050 is based, and that it is entitled to payment of fuel surcharges under the contract for the first well, upon which Invoice No. 1051 is based.  Cypress provided notice of the invoices to Griffin, and Griffin made no objections during the fifteen days permitted by contract.  Thus, Griffin breached the IADC contract with Cypress by failing to pay these invoices.

Griffin does not defend against these claims.  Rather, Griffin points out that it raised offset as a third affirmative defense in its Answer and argues that any amounts due to Cypress should be offset by a total of $270,000.00 more that Griffin had to pay to another operator to complete the drilling of the remaining wells under the contract and for running the casing on B.R. F-46.  Griffin also alleges that it had to pay to clean up the B.R. F-46 well site, but cites no evidence regarding the cost of cleanup.

Section 5 of the IADC contract provides that "[p]ayment is due to the contractor upon operator receipt of invoice."  [Exhibit 127].  Section 5.3 provides the period for objections as follows:

> Operator shall, within fifteen days after receipt of the invoice, notify Contractor of the item disputed, specifying the reason therefor, and payment of the disputed item may be withheld until settlement of the dispute, but timely payment shall be made of any undisputed portion . . . .

---

[28]Griffin did not file a counterclaim in this matter.

[Exhibit 127].  Finally, Section 5.4 states that if the contract "is placed in the hands of an attorney for collection of any sums due hereunder, or if suit is brought on same . . . the Operator agrees that there shall be added to the amount due reasonable attorney's fees and costs."  [Exhibit 127].

The Court finds that Griffin breached the IADC contract by failing to pay Invoice Nos. 1050 and 1051 and that it is not entitled to an offset for these amounts.  Griffin was presented with the invoices and had two options under the contract: (1) pay the invoices or (2) object within fifteen days. Griffin did neither and is in breach of contract.

Nonetheless, Griffin argues that it is entitled to offset these amounts because "Cypress'[s] actions in causing the rig to fall and its inability to complete the contract as executed . . . forced" Griffin to find another contractor at a greater cost.

Although Griffin cited the Court to no law, the Court's research reveals that setoff, when used as a defense, is an equitable remedy under Mississippi law.  *See St. Paul Ins. Cos. v. Gentry*, 340 So.2d 442, 442-43 (Miss. 1976); *Brock v. Adler*, 177 So. 523, 534 (Miss. 1937); *see also* BLACK'S LAW DICTIONARY 1120 (8TH ED. 2004) ("A debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor; the counterbalancing sum owed by the creditor.").  In this case, the Court finds that equity does not compel the result Griffin seeks.  Griffin has presented evidence only that it contracted to and actually paid Tri-State $270,000.00 more than it would have had to pay Cypress to case B.R. F-46 and drill the remaining wells under the IADC contract.  However, Griffin has presented no evidence of the cost of cleanup alone or that the price it paid to Tri-State was not fair market value for the services rendered.  In other words, the fact that Cypress may have given Griffin a better price does not mean that the price paid to Tri-State was unreasonable, unfair, or not the same price it would have had to pay to any other contractor.  Finally, the Court ruled only that Cypress failed to prove that Griffin's breach of its duty to provide a sound location was the cause of the rig turn over, not that

19

Cypress caused the rig turn over.

Griffin was aware of and chose not to pay or object to invoices properly submitted by Cypress, and the Court finds the equitable remedy of setoff inapplicable.  Accordingly, judgment is rendered in favor of Cypress and against Griffin in the amount of $22,355.53 in payment of Invoice Nos. 1050 and 1051, plus judicial interest from date of judicial demand.

Under Mississippi law, a party may recover attorney's fees if they are provided for in the contract at issue. *Garner v. Hickman*, 733 So.2d 191, 198 (Miss. 1999).  Under the plain language of the IADC contract, Cypress is entitled to recover reasonable attorney's fees and costs incurred because it was required to retain an attorney to collect on Invoice Nos. 1050 and 1051 and, in fact, had to bring this lawsuit to obtain payment.[29]  Thus, the Court further finds that Cypress is contractually entitled to reasonable attorney's fees and costs related to the collection of these invoices and awards attorney's fees and costs in an amount to be determined.

### 3.      Unilateral Termination of IADC Contract

Finally, Cypress contends that it is entitled to recover either lost profits or liquidated damages under the IADC contract based on Griffin's unilateral and wrongful termination.

Griffin responds that, based on the contractual language, it was entitled to terminate the IADC contract, did so, properly notified Cypress through Boyette, and formalized its notification with a letter from its attorney to the attorney for Cypress.[30]

Pursuant to Griffin's addition to the IADC contract, agreed to by Cypress, Griffin "had the right

---

[29]The Court rejects Griffin's argument that Cypress cannot recover costs and attorney's fees because the IADC contract provision is limited to collection actions.

[30]Griffin also argues that Cypress cannot be allowed to recover liquidated damages, but the Court need not reach this issue.

to terminate [the] contract" if Cypress was "unable due to equipment failure, labor problems, or any other problems not controlled by [Griffin] to drill the wells." [Exhibit 127]. In this case, the Court has found that Cypress failed to prove by a preponderance of the evidence that Griffin breached the contract by failing to provide a sound location. Further, the evidence at trial showed that the rig was not removed until May 28, 2005, and took several months to repair,[31] and according to Mrs. Mixon, Cypress "chose not to" continue its contractual relationship with Griffin. [Trial transcript, p. 880]. Thus, Griffin had the right to terminate the contract and obtain another drilling contractor[32] to complete the wells in a timely manner.

Judgment is rendered in favor of Griffin and against Cypress on its claim that Griffin improperly terminated the contract.

## II.    CONCLUSION

For the foregoing reasons, Judgment is rendered in favor of Cypress and against Griffin on Cypress's breach of contract claims for non-payment of Invoice Nos. 1050 and 1051 in the amount of $22,355.53, plus judicial interest from date of judicial demand, and reasonable attorney's fees and costs in an amount to be determined. Cypress and Griffin shall attempt to reach agreement on the reasonable attorney's fees and costs incurred by Cypress in collecting on Invoice Nos. 1050 and 1051. If they cannot reach agreement, then, within fourteen days of the date of this Judgment, Cypress must submit contemporaneous billing records or other appropriate evidence supported by a declaration or affidavit

---

[31]The rig was repaired and sold.

[32]The fact that John Andrew Griffin had met with Tri-State the night before the rig fell is of no consequence. There is no evidence that he signed a contract with Tri-State that night. The evidence suggests that John Andrew Griffin and Boyette had serious concerns about Cypress's ability to drill the remaining wells and about its operating methods, but the Court does not find those concerns to be in the nature of an anticipatory breach.

21

of counsel to show the reasonable attorney's fees and costs incurred in collecting on Invoice Nos. 1050 and 1051 for a determination by the magistrate judge.

Judgment is rendered in favor of Griffin and against Cypress on Cypress's remaining breach of contract claims.

Having determined that Griffin is not liable to Cypress for the rig turn over, Griffin's third-party claim against Delaney is moot.  To the extent necessary, judgment is rendered in favor of Delaney and against Griffin on Griffin's third-party claim.

All pending motions are denied as moot.

MONROE, LOUISIANA, this 31st day of March, 2010.


**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**

22